UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| BARBARA L. PARKER, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO. 3:09-CV-00418 JD |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

On September 10, 2009, Plaintiff, Barbara L. Parker ("Parker"), filed her Complaint in this Court [DE 1]. Defendant, Commissioner of Social Security ("Commissioner"), filed an Answer to Parker's Complaint on November 12, 2009 [DE 5]. On February 10, 2010, Parker filed an opening brief in support of her request for a remand [DE 13]. The Commissioner filed a response brief on June 1, 2010 [DE 18], to which Parker replied on June 21, 2010[1] [DE 22].

For the reasons that follow, this Court reverses the final decision of the Commissioner, and remands the case for a hearing consistent with this opinion.

## **I. PROCEDURAL HISTORY**

On October 31, 2005, Parker filed her application under Title II of the Social Security

---

[1] Parker's counsel admits to inadvertently filing an incomplete draft of his opening brief, which did not adequately address the issues relevant to Parker's appeal. However, Parker's Complaint sufficiently put the Commissioner on notice that the claimed error was relative to the ALJ's RFC determination and failure to consider the opinion of her primary care physician. *See* [DE 1 at ¶¶ 8-9]. Such notice is confirmed by the fact that counsel for the Commissioner responded to Parker's position, and argued that the RFC determination was supported by substantial evidence. *See* [DE 18 at 10-11]. Additionally, any further response by the Commissioner is not going to negate the lack of necessary findings in the ALJ's decision, as discussed herein.

Act ("SSA") for a period of disability and disability insurance benefits (Tr. 67-72), as a result of osteoarthritis[2] and Crohn's Disease,[3] with an alleged onset date of May 15, 2004. (Tr. 95-96). *See* 42 U.S.C. §§ 416(i), 423. Parker's application was initially denied on February 13, 2006 (Tr. 53-56), and again denied upon reconsideration on June 1, 2006. (Tr. 49-51).

On August 27, 2008, Parker, represented by counsel, appeared and testified at a hearing held before Administrative Law Judge Richard VerWiebe ("ALJ"), in South Bend, Indiana. (Tr. 242-63). On November 20, 2008, the ALJ denied Parker's claim. (Tr. 21). The ALJ found that Parker had not engaged in substantial gainful activity since May 15, 2004, and that she suffered from the severe impairments of irritable bowel syndrome and osteoarthritis. (Tr. 18). However, the ALJ determined that Parker did not have any impairment or combination of impairments that met the description of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. The ALJ found that Parker had the residual functional capacity ("RFC")[4] to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except that she cannot stand for extended

---

[2]Osteoarthritis is the most common form of arthritis. It causes a break down of the cartilage in the joints causing pain, swelling, and reduced motion in the joints. It usually affects the hands, knees, hips, or spine. *See* Medlineplus as a Service of the U.S. National Library of Medicine and National Institutes of Health, http://www.nlm.nih.gov/medlineplus/osteoarthritis.html (last visited Sept. 24, 2010).

[3]Crohn's Disease causes inflamation of the digestive system. It is one of a group of diseases called inflammatory bowel disease. Common symptoms are pain in the abdomen and diarrhea, bleeding from the rectum, weight loss, joint pain, skin problems and fever. *See* Medlineplus as a Service of the U.S. National Library of Medicine and National Institutes of Health, http://www.nlm.nih.gov/medlineplus/crohnsdisease.html (last visited Sept. 24, 2010).

[4]"Residual Functional Capacity" is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §404.1545(a)(1).

periods without the need to change positions.[5] *Id*. Based on Parker's RFC, and the physical and mental demands of her past relevant work, the ALJ determined that Parker was capable of performing her past relevant work as a print shop manager. (Tr. 20). Therefore, the ALJ found that Parker was not disabled. (Tr. 21).

On November 20, 2008, Parker filed a request for review of the hearing decision with the Appeals Council. (Tr. 11). Parker presented the Appeals Council with a brief and a functional capacity evaluation on February 17, 2009. (Tr. 6, 222-41). On July 8, 2009, the Appeals Council denied review; and as a result, the ALJ's decision became the Commissioner's final decision. (Tr. 3-5). 42 U.S.C. § 405(g); 20 C.F.R. § 404.981; *see Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). Parker's Complaint is now ripe for this Court's review of the ALJ's decision.

## II. FACTS

At the time of the ALJ's decision, Parker was 56 years of age. (Tr. 67). Parker speaks English, graduated from high school in 1970, and attended a short term trade school to learn typesetting in 1978. (Tr. 95, 101). Her past relevant work experience includes owning a print shop, where she worked as a typesetter and a graphic designer. (Tr. 96-97, 246). As the manager of the print shop, she managed several employees and arranged vendor contracts. (Tr. 246). Parker sold the business and stopped working on May 15, 2004, due to her inability to maintain daily activities. (Tr. 95-96, 246).

---

[5]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

Hearing Testimony

During her hearing before the ALJ, Parker testified that she sold the business when she started to limp, her hips were giving out, and she was suffering from back and hip pain. (Tr. 246, 249, 251). She reported that her Crohn's Disease was misdiagnosed, and instead she had irritable bowel syndrome ("IBS"),[6] which causes severe diarrhea (to the point that she cannot get off of the couch), fatigue, cramping, bloating, and dehydration. (Tr. 247-48). Her health problems were what caused Parker to become her own boss in the first place, because on average she would miss 5 days of work each month, with her missing as few as 2 days, but as many as 2 weeks. (Tr. 248).

Parker believed that the source of her hip problems was related to the steroid she was prescribed for her Crohn's Disease. (Tr. 250). She refused to have a colonoscopy done, as recommended in 2006, because emptying her colon puts it into a flare, and she felt as though she could control it without purposefully causing a flare. *Id*. Additionally, Parker testified that she has back pain "all the time, even when [she's] laying down," but if she sits up the pain increases from a 3 to a 5 (on a pain scale up to 10), and when she walks or bends the pain increases to a 7. (Tr. 252). Sometimes she gets a "shock" of pain from her left hip, which rates at a 9 on the pain scale. (Tr. 253). She takes extra strength Tylenol "all the time," Darvocet, and Vicodin for the pain, and sometimes uses a cane to ambulate. *Id*.

Parker testified that she could sit for up to 20 minutes and walk for up to 20 minutes, but standing would be more painful. (Tr. 254). She believed that she could lift 17 pounds, but noted

---

[6]IBS affects the large intestine and can cause abdominal cramping, bloating, a change in bowel habits, and sometimes constipation, diarrhea, or both. *See* Medlineplus as a Service of the U.S. National Library of Medicine and National Institutes of Health, http://www.nlm.nih.gov/ medlineplus/irritablebowelsyndrome.html (last visited Sept. 24, 2010).

that she has trouble managing the stairs in her home, and she must rest and lay down for approximately 2 hours out of the day, especially during chores. (Tr. 246, 255-56). She described her daily activities as sitting around, doing housework, reading, and watching television, but needing someone to help her maintain the house. (Tr. 257-58). She is also able to go outside with the dogs and water the plants. (Tr. 258). But with her arthritis, pain in her hands, and inability to grip, she is unable to crochet, golf, or walk the dogs. (Tr. 259-60). Parker does not believe that she could go back to work, because she always has some problem with either her hip, diarrhea, or hands. (Tr. 260).

After Parker testified, the ALJ explicitly stated that he found her to be "a very credible witness." (Tr. 260). In fact, Parker's mother-in-law also testified and described how Parker "was capable of doing everything" when she started the printing business, but at the end, she saw Parker experience pain and discomfort every day. (Tr. 263).

Medical Evidence

Parker's medical records reveal that she began seeking treatment from her family physician, Dr. Basman Salous, at least since 2002 (Tr. 125). At that time, she presented with complaints of sinus congestion. *Id*. In January 2004, Parker presented with a swollen thumb and osteoarthritis, and in April, she presented with high blood pressure and denied any GI or urinary symptoms. (Tr. 124). In June, Parker went to Med Point for pain in her back, neck, and chest. (Tr. 126).

In August 2004, Parker had a followup with Dr. Salous for her hypertension. (Tr. 123). At this time, she reported having Crohn's Disease a long time ago, and complained that it was acting up again. *Id*. Dr. Salous noted that Parker had abdominal pain on the right side, but did

5

not think her complaints sounded like Crohn's Disease. *Id*. She was not experiencing any blood in her stools, fever, abscesses, vomiting, or respiratory symptoms. *Id*. Dr. Salous referred her to Dr. Patel for an evaluation of Crohn's Disease. *Id*.

In November 2005, Dr. Salous discussed Parker's being disabled because she "can't hold a job" on account of her Crohn's Disease, osteoporosis, and pain in her hands, hips, and neck. (Tr. 119-20). Her pain got worse when she increased her activity. *Id*. At the time, she was not taking any prescriptions for her diarrhea, except for over-the-counter antigas medication. *Id*. Dr. Salous admitted that he did "not have much history about her about Crohn's disease and [his] file does not show much of that, so [he] was unable to write a letter to anyone about her Crohn's disease because [he has] no history dealing with her Crohn's disease." (Tr. 119). He noted that Parker refused to have a colonoscopy because she had a lot of them done in the past, and she did not think that having another one would do anything extra for her. *Id*.

In January 2006, Dr. Peter Sices conducted a consultative examination of Parker. (Tr. 114-16). Parker alleged that she was disabled due to Crohn's Disease, which she had since she was 7 years old. (Tr. 114). Parker explained that she experienced diarrhea, bloating, and cramping. *Id*. Dr. Sices noted that she had never undergone any surgery for Crohn's Disease and that she was not taking any medications for it, except for over-the-counter drugs. *Id*. Parker also complained of arthritic pain in her hips and knees. *Id*. Dr. Sices reported that her gait was normal, she walked without a limp, and she did not use a device to assist with ambulation. *Id*. Parker was able to get on and off the examination table without complaints of pain or fatigue. (Tr. 115). Dr. Sices further reported that Parker's standing station, range of motion, muscle strength, and grip strength were normal. *Id*. Dr. Sices diagnosed Parker with untreated Crohn's

6

Disease and possible neuromuscular disorder, and opined that she did not have an impairment related to gait, coordination, hearing, speech, memory, concentration, attention span, social interactions, or fine and gross manual dexterity. *Id*.

In February 2006, Dr. Whitley, a state agency reviewing physician, stated that Parker did not meet or equal a listing based on her Crohn's Disease and/or diarrhea. (Tr. 25). In May 2006, Dr. Jonathon Sands, another state agency reviewing physician, affirmed Dr. Whitley's opinion. (Tr. 23). On May 19, 2006, state agent physician, Dr. Kladder, conducted a psychiatric assessment and opined that Parker did not have a medically determinable mental impairment. (Tr. 134-47).

On April 18, 2006, Parker saw Dr. Salous again for joint pain and Crohn's Disease. (Tr. 118). He noted that Parker was experiencing joint pain for a while in her hips, knees, and shoulders. *Id*.

In June 2006, Dr. Nicholas Straniero, a rheumotologist, conducted an examination of Parker. (Tr. 168-81). Parker complained of problems with her hands and right shoulder, and pain in her neck and hips. (Tr. 168). He noted that her musculoskeletal symptoms and joint pain dated back some 5 years, including pain in her hands. *Id*. Dr. Straniero reported that she received some treatment for Crohn's Disease from a gastroenterologist in the past, but had simply "self-managed" her inflammatory bowel syndrome which caused diarrhea but not bleeding. (Tr. 169). Dr. Straniero's clinical findings were a decreased range of motion in her right shoulder and hips, with a possible underlying degenerative change. (Tr. 170-71). He noted that Parker had a reduced mobility in the C-spine, with diminished flexion and extension at the lumbar spine. *Id*. He further noted that she walked with a limp favoring the right hip, and her

hands showed a bit of fullness. *Id*. Dr. Straniero ordered Parker to undergo x-rays on her right hand, right shoulder, hips, and back. (Tr. 171).

As directed, Parker underwent several x-rays in June 2006. (Tr. 190-94). X-rays of her right hand revealed small marginal erosions without evidence of other arthritic or bony abnormalities, which was suggestive of inflammatory arthritis/rheumatoid variant. (Tr. 167, 190). X-rays of her right shoulder were normal. (Tr. 167, 191). X-rays of Parker's hips revealed that she had moderately severe osteoarthritis in both hips, with marked loss of internal rotation with relatively preserved external rotation. (Tr. 167, 193-94). X-rays of her lower back revealed some degenerative disc narrowing and bilateral lower lumbar facet joint osteoarthritis. (Tr. 167, 192). Based on these diagnostic testing results, Dr. Straniero reported that Parker's major concern was the relatively advanced degenerative joint disease in her hips, which put her at risk of needing a hip replacement at a relatively early age. (Tr. 167). Dr. Straniero prescribed Celebrex and a non-steroidal anti-inflammatory drug in order to help treat Parker's arthritis pain. (Tr. 167).

In July 2006, Dr. Pankaj Patel, a gastroenterologist, examined Parker in consultation for her diarrhea. (Tr. 220-21). Dr. Patel noted that, although she was in the process of filing for disability for Crohn's Disease and arthritis, Parker did not seem particularly disabled upon examination, although she complained of aches and pains in her joints. (Tr. 220). Dr. Patel reported that she was diagnosed with Crohn's Disease at age 6 or 7, but had not seen a gastroenterologist over the past 20 years. *Id*. Dr. Patel questioned whether Parker's diagnosis of Crohn's Disease was really IBS. (Tr. 221). He recommended that Parker undergo a colonoscopy. *Id*.

In August 2006, Dr. Straniero summarized his treatment of Parker and concluded that his examinations suggested that she had erosive osteoarthritis in her hands which affected them mildly to moderately, possible rotator cuff dysfunction in her right shoulder, and moderately severe advanced osteoarthritis in her hips. (Tr. 208). Dr. Straniero opined that Parker would be unable to stand or walk for any length of time, likely under one hour on any continuous basis. *Id*.

In October 2006, Dr. Straniero again reported that Parker's main difficulties were with respect to the osteoarthritis in her hips which was very painful, limited her activity, and disturbed her sleep. (Tr. 166). Parker stated that she took the medications prescribed by Dr. Straniero for a while, but then discontinued them when she developed diarrhea. *Id*. Dr. Straniero's physical examination found a decreased range of motion in Parker's right shoulder and hips. *Id*. Dr. Straniero reported that she would likely require hip replacement surgery to obtain any significant relief from her symptoms, and recommended that Parker receive an orthopedic opinion. *Id*.

In December 2006, Dr. Frederick Ferlic, an orthopaedic surgeon, conducted a consultative examination of Parker's hip problems. (Tr. 196-97). Dr. Ferlic noted that she was having trouble with her activities of daily living, and that she had an antalgic gait on her right side when she walked. (Tr. 196). She had no internal rotation of her right hip, and her left hip had some moderate limitation of motion. *Id*. Dr. Ferlic reported that x-rays revealed significant osteoarthritis in both hips, and that her right hip was down to bone on bone, and her left hip was almost the same. *Id*. Dr. Ferlic told Parker that the only solution for her symptoms would be hip replacement surgery, and Parker agreed. (Tr. 197).

In April 2007, Parker sought a second opinion and saw Dr. Stephen Mitros, an orthopaedic surgeon. (Tr. 189). Dr. Mitros reported that Parker "hammers her way through her

daily activities, but frequently awakens at night with discomfort." *Id*. Parker had a mild limp secondary to decreased extension at the right hip, and a remarkably restricted internal rotation of each hip with a good deal of discomfort. *Id*. Her x-rays revealed bilateral hip osteoarthritis of a moderate to severe degree. *Id*. They discussed treatment options, including hip replacement. *Id*.

In June 2007, Dr. Mitros performed Parker's total right hip replacement due to her osteoarthritis. (Tr. 186). Over the next few weeks, Dr. Mitros reported that Parker was getting along well with a cane. *Id*. He noted that her post surgery x-rays looked great. *Id*.

Just over a month later, Dr. Mitros saw Parker and noted that she was getting along nicely post surgery. (Tr. 188). She was not using any ambulatory aids and was walking well. *Id*. Dr. Mitros noted that Parker seemed to be satisfied with her pain relief. *Id*. He encouraged her to attend therapy sessions in order to learn a home therapy program to improve her fitness. *Id*.

In September 2007, Dr. Mitros reported that Parker's hip replacement surgery had gone well. *Id*. She was able to move about his office easily without limping on her left side. *Id*. Dr. Mitros noted that her left hip was not bothering her enough to warrant surgical intervention, and she could return to full activities. *Id*. Dr. Mitros reported that Parker's only complaint was of some residual stiffness, which he indicated would take about 6 months to resolve. *Id*.

In September 2007, Dr. Straniero reported that Parker had received good pain relief from her hip replacement surgery. (Tr. 164). He noted that she still had some reduced rotation in the right hip status post replacement, but that her left hip was reasonably mobile. *Id*. Parker continued to complain of chronic recurrent diarrhea, as well as joint pain in her neck, hands, shoulders, and left hip. *Id*. She did not follow Dr. Patel's recommendation to get a colonoscopy. *Id*. Dr. Straniero was certain she presented evidence of degenerative arthritis. (Tr. 165).

10

In February 2008, Dr. Salous completed a Physician's Opinion of Patient's Physical Limitations form for Parker. (Tr. 148-50). Dr. Salous opined that Parker could sit, stand, and walk for no more than an hour each, in an 8 hour workday. (Tr. 148). Dr. Salous also opined that she could lift up to 20 pounds occasionally, but never more. *Id*. Dr. Salous believed that Parker could frequently reach, handle, and finger (pick/pinch), but only occasionally stoop, squat, climb stairs, reach above shoulder level, kneel and crouch. *Id*. Parker could handle mild exposure to dust, fumes, and gases, moderate exposure to moving machinery and marked changes in temperature and humidity, and unlimited exposure to unprotected heights. (Tr. 149). Dr. Salous believed that she would likely have to lie down periodically during the day to relieve pain and/or fatigue, and that pain, malaise, or fatigue would likely impair her ability to maintain adequate concentration for even unskilled work and would make her attendance unreasonably unpredictable. *Id*. Dr. Salous associated these limitations to Parker's severe arthritis in her hips, back, neck, and hands, and he did not believe that she was capable of working. *Id*. He further noted that she also suffered from Crohn's Disease, and he believed that the entirety of his opinion was supported by objective medical evidence including records contained in Dr. Straniero's records, some of which he had reviewed. (Tr. 150).

In March 2008, Dr. Straniero completed a Physician's Opinion of Patient's Physical Limitations form for Parker. (Tr. 209-211). Dr. Straniero opined that Parker could sit, stand, and walk for no more than 2 hours each, in an 8 hour workday. (Tr. 209). He stated that she could lift up to 50 pounds occasionally and up to 10 pounds frequently. *Id*. He further stated that Parker could frequently reach above shoulder level, use hands to handle, and finger (pick/pinch), and could occasionally stoop and climb stairs, but could never squat, kneel, or

11

crouch. *Id*. He also opined that Parker was moderately limited from working around unprotected heights, and could never be around moving machinery, be exposed to marked changes in temperature and humidity, be exposed to dust, fumes, or gases, and could not stand for extended periods of time (i.e. 20 minutes) without the need to change position. (Tr. 210). He concluded that she was capable of working 4 to 8 hours per day, and that it was possible that her pain, malaise or fatigue would make her sustained routine attendance at work for 8 hours per day unreasonably unpredictable. *Id*.

In April 2008, Dr. Michael Manbeck, a gastroenterologist, reported that Parker's blood work results indicated that she probably did not have Crohn's Disease. (Tr. 214-19). He opined that her chronic gastrointestinal complaints were likely IBS. (Tr. 215).

### III. STANDARD OF REVIEW

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). In its review, the district court will affirm the Commissioner's finding of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the court considers the entire administrative

record but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [the court's] own judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citation omitted). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an inadequate discussion of the issues. *Id.* Further, conclusions of law are not entitled to deference, so if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

## IV. ANALYSIS

Generally, disability and supplemental insurance "[b]enefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). The claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following set order:

1. Whether the claimant is currently doing any substantial gainful activity;
2. Whether the claimant has a medically severe impairment;

13

3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can make an adjustment to other work.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). If the ALJ finds that the claimant is disabled or not disabled at any step, then the ALJ may make his determination without evaluating the remaining steps. 20 C.F.R. § 404.1520(a)(4).

Parker contends that the ALJ's determination of her RFC was not based on substantial evidence, and as such, Parker requests that her case be remanded.

**A.     RFC Determination**

Parker argues that the ALJ's RFC determination is in error because the ALJ dismissed evidence in the record that was contrary to his conclusion, and relied on the remaining evidence to find that Parker was capable of performing sedentary work. Specifically, Parker argues that the ALJ failed to discuss the opinion and disabling limitations outlined by Parker's primary care physician, Dr. Salous. The Commissioner responds that the RFC determination was supported by substantial evidence, namely the medical records of the other doctors who treated Parker.

The ALJ must determine the claimant's residual functional capacity before performing steps four or five. *Young*, 362 F.3d at 1000. Residual functional capacity is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Id.*; 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1); SSR 96-8p. This finding must be assessed based on all the relevant

14

evidence in the record, 20 C.F.R. § 404.1545(a)(1), must consider all medically determinable impairments even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000). An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (citations omitted). However, the ALJ may discount medical evidence as long as the ALJ minimally articulates some justification for rejecting evidence of a disability. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *see Murphy*, 496 F.3d at 634 (noting that the ALJ cannot ignore evidence supporting a finding of disability, but must fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that the reviewing court can follow his reasoning). The ALJ has final responsibility for deciding a claimant's residual functional capacity, which is a legal decision rather than a medical one. *See* 20 C.F.R. §§ 404.1546(c), 404.1527(e).

In calculating Parker's RFC, the ALJ stated, "In making this [RFC] finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, . . . [and] [t]he undersigned has also considered opinion evidence" (Tr. 18-19). But the ALJ's decision does not reflect that he did what he said he did. The Court agrees with Parker, in that the ALJ completely ignored Dr. Salous' medical opinion, and as such, the decision cannot stand.

Under 20 C.F.R. § 404.1502, a treating physician means:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you . . . [where] you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s) . . .[But one is not

15

> considered a] treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability.

Pursuant to this definition, there is no doubt that Dr. Salous was one of Parker's treating physicians. Progress notes from Dr. Salous' practice group confirm that Parker received medical evaluation and treatment for her various medical problems from Dr. Salous on multiple occasions for over 8 years. In fact, Dr. Salous' records are the only records from 2004 and 2005 that identify Parker's complaints of joint pain and recurrent problems with her Crohn's Disease (or IBS). Thereafter, Parker continued to treat with Dr. Salous relative to her joint pain and Crohn's Disease, and sought his medical attention as her family physician for general medical complaints.

As a treating physician, Dr. Salous' opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it (1) was supported by medical findings; and (2) was consistent with substantial evidence in the record. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004)). However, while the treating physician's opinion is important, it is not the final word on a claimant's disability, and a claimant is not entitled to benefits merely because a treating physician labels her disabled. *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007) (citation omitted). An ALJ may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability. *Id*. (citing *Skarbek*, 390 F.3d at 503).

Not only did the ALJ fail to discuss the weight he gave to Dr. Salous' opinion and the

reasons for that weight, 20 C.F.R. § 404.1527(d)(2); SSR 96-8p, the ALJ wholly omitted any discussion of Dr. Salous' treatment of Parker in his decision. Nowhere in the ALJ's determination does he consider Dr. Salous' opinion of Parkers' impairments and resulting limitations, despite the fact that Dr. Salous treated Parker for over 8 years relative to impairments at issue here. Because the ALJ did not sufficiently articulate his decision for discounting and completely abandoning Dr. Salous' opinions, the reasons for his decision are not supported by substantial evidence. *See Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998) (the failure so much as to mention the competent medical evidence that went contrary to other medical evidence made the ALJ's explanation for his decision to deny benefits unacceptable).

Notably, both Drs. Salous and Straniero completed the same Physician's Opinion of Patient's Physical Limitations form for Parker, only a month apart in 2008. Yet, the ALJ only considered Dr. Straniero's opinion (Tr. 20), and never discussed how that opinion was similar to, or different from, Dr. Salous' opinion. (Tr. 148-50). Further, the ALJ never expressed the weight that he gave to each of the opinions, which was necessary to do here because they were different. Specifically, Dr. Salous opined that Parker could sit, stand, and walk for no more than an hour each, in an 8 hour workday, but Dr. Straniero opined that she could last for 2 hours. Unlike Dr. Straniero, Dr. Salous believed that Parker would need to lie down periodically during the day to relieve pain and/or fatigue, and that her pain, malaise, or fatigue would likely impair her ability to maintain adequate concentration for even unskilled work. Ultimately, Dr. Salous' medical opinion was that Parker was not capable of performing work at all, which contradicted the ALJ's conclusion that she had the RFC to perform sedentary work.

Additionally, while the ALJ relied only on Dr. Straniero's physical assessment, the ALJ

incorrectly stated that Dr. Straniero only restricted Parker from standing for extended periods of time. However, in reality, Dr. Straniero opined that Parker had further limitations, and noted that she could only occasionally stoop and climb stairs, could never squat, kneel, or crouch, could never be around moving machinery, be exposed to marked changes in temperature and humidity, or be exposed to dust, fumes, or gases, and he believed that she was capable of only working 4 to 8 hours per day. Thus, while the ALJ relied on Dr. Straniero's assessment of Parker in making the RFC determination, he did so without properly considering all of the medical limitations that Dr. Straniero opined that Parker suffered.

Both Drs. Salous and Straniero believed that Parker's pain, malaise, or fatigue could make her routine attendance at work unreasonably unpredictable. Again, there was no mention of these medical findings in the ALJ's opinion or RFC determination. As a result, the RFC finding was not based on all of the relevant evidence and did not consider all of Parker's limitations, including non-severe ones.

Had the ALJ believed that Dr. Salous' opinion was inconsistent with the other medical evidence, or unsupported by proper medical techniques, he was still required to minimally articulate his reason for finding the same. *See Clifford*, 227 F.3d at 870. The Court realizes that an ALJ need not discuss every piece of evidence in the record, so long as he builds a logical bridge from the evidence to his conclusion. *Denton v. Astrue*, 596 F.3d 419, 477 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding). In this case, because the ALJ did not articulate his reasons for ignoring or rejecting relevant medical evidence, *see* SSR 96-8p, the Court cannot trace the path of the ALJ's

18

reasoning. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (an ALJ's decision must be based upon consideration of all the relevant evidence and the ALJ must articulate at some minimal level his analysis of the evidence). As such, remand is appropriate.

**B.      Steps 4 and 5**

On remand, after reevaluating the RFC determination, the ALJ must decide what, if any, employment Parker is capable of performing. 20 C.F.R. § 404.1520(f). If Parker cannot perform her past work, the question becomes whether she has the capability of performing other work in the national economy. *Tom v. Heckler*, 779 F.2d 1250, 1253 (7th Cir. 1985); 20 C.F.R. § 404.1520(g).

Because the ALJ did not properly calculate Parker's RFC, the Court has no way of knowing if Parker could actually perform the functional demands and job duties of her past occupation, either as actually performed or as generally required by employers throughout the national economy. *Orlando v. Heckler,* 776 F.2d 209, 215-16 (7th Cir. 1985) (citing SSR 82-61); *see Getch v. Astrue*, 539 F.3d 473, 482 (7th Cir. 2008) (the ALJ need not conclude that the claimant is capable of returning to the precise job she used to have; it is enough that the claimant can perform jobs substantially like that one). Because there is insufficient evidence and explanation to conclude that Parker is capable of performing her past work, the case must be remanded. *See* SSR 86-8 (noting that the decision as to whether the claimant retains the functional capacity to perform her past work "has far-reaching implications and should be developed and explained fully in the disability determination . . . [s]ince this is an important and, in some instances, a controlling issue, every effort should be made to secure evidence that resolves the issue clearly and explicitly.").

19

As to Parker's ability to perform other work in the national economy, substantial evidence in the record must support such a finding. *Tom*, 779 F.2d at 1254. In this case, the ALJ never reached a step five conclusion, and on this record, the Commissioner cannot bear its burden of showing that Parker can adjust to other work in the economy.

In light of the ALJ's erroneous residual functional capacity determination, the ALJ's conclusion that Parker is not disabled is the result of legal error and is not supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The record does not command a determination that Parker should be awarded benefits, but the ALJ has not adequately supported his conclusions.

## V. CONCLUSION

For the foregoing reasons, the Court REVERSES the final decision of the Commissioner of Social Security, and REMANDS the case for a hearing consistent with this opinion.

SO ORDERED.

ENTERED:  September 28, 2010

                                                    /s/ JON E. DEGUILIO
                                              Judge
                                              United States District Court